UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:   16-20837-CR-SEITZ/TURNOFF

UNITED STATES OF AMERICA,

vs.

HARRISON GARCIA,

Defendant.

_____/

## REPORT AND RECOMMENDATION

**THIS CAUSE** is before the Court upon Defendant, Harrison Garcia's ("Defendant's") Motion to Suppress Evidence and Statements **(ECF No. 26)**, and an Order of Referral entered by the Honorable Patricia A. Seitz.  **(ECF No. 34)**.   A hearing on the Motion **(ECF No. 26)** took place before the undersigned on Monday, January 23, 2016.  **(ECF No. 52)**.  Upon review of the court file, the applicable law,  hearing testimony,[1] argument from counsel, and being otherwise duly advised in the premises, the undersigned makes the following findings.

## Background

Defendant was initially arrested and charged by way of a Complaint on October 18, 2016. **(ECF No. 1)**.  He was later indicted, on November  2, 2016, and charged with conspiracy to possess with intent to distribute controlled substances, maintaining a drug-involved premises, possession with intent to distribute a controlled substance,  and possession of a firearm in furtherance of a drug-trafficking crime.  **(ECF No. 10)**.  The drugs at issue  are marijuana, promethazine with Codeine, a prescription cough syrup/controlled substance commonly known as "lean," and Alprazolam,  the

_____

[1]Defendant testified at the hearing, as did Special Agent Rimas Sliazas ("Agent Sliazas").

Id.

generic form of Xanax.   Id.

This case stems from an investigation wherein Homeland Security Investigations ("HSI") identified an Instagram[2] account belonging to Defendant.  **(ECF No. 1)**.   In his Instagram posts, Defendant appears to be boasting about his life as a drug dealer.  **(ECF No. 35, Ex. A)**. Specifically, the images depict him posing with bottles of promethazine with Codeine, other prescription drugs, marijuana, jewelry, firearms and large amounts of U.S. currency.  Id.  The investigation included surveillance and controlled narcotics purchases using a documented confidential informant ("CI").  **(ECF No. 35)**.  These controlled transactions took place on August 26, 2016 and September 23, 2016.  Id.

At issue here, among other things, are two search warrants.  The first search warrant was obtained on September 26, 2016. **(ECF No. 35-3)**.   This warrant, which relates to Defendant's Instagram account, "muhammad_a_lean," was presented before U.S. Magistrate Judge Patrick A. White under Case No: 16-3318 -MJ- PAW. Id.   It generated records, including direct messages, in which Defendant appeared to be negotiating the sale of lean and other controlled substances.  Id. Upon receipt and review of the Instagram records, a second search warrant application was prepared and presented before U.S. Magistrate Judge Alicia Otazo-Reyes, on October 14, 2016, under  Case No: 16-MJ-03411-AOR.  **(ECF No. 35-4)**.  This warrant relates to a dwelling located at 7751 S.W. 29th Street, Miami, Florida ("target premises"), a location where Defendant was believed to currently be, or previously have been, residing.    Id.

---

[2]Instagram is a free-access social-networking website.  It allows users to create their own profile pages, which can include a short biography, a photo of themselves, and other information.

## Summary of Defendant's Arguments

Defendant questions the validity of both warrants **(ECF No. 26)**, and seeks to suppress statements and evidence obtained as the result of what he calls an illegal and unconstitutional stop, detention, search and  seizure.  Id.   In light of this, Defendant requests a Franks[3] hearing.  Id. Defendant also makes the following arguments:  (1) The traffic stop was pretextural, and lacking in probable cause;  (2) The search and seizure were illegal; (3)  His Fifth and Sixth Amendment rights were violated; and therefore, any evidence seized should be suppressed.  Id.  The Government, on the other hand, argues that Defendant's arrest was based on probable cause, and thus, the subsequent vehicle search was appropriate.  **(ECF No. 35)**.   The Government further contends that Defendant waived Miranda and consented in writing to the search, seizure and forfeiture of his property.  Id.

At the hearing, defense counsel conceded that the real issues are whether Defendant effectively communicated a request for an attorney, and whether he voluntarily executed the waiver and consent forms.   Hr'g. Mot. Suppress Tr. 13:3-24 Jan .23, 2017.[4]  Specifically, counsel stated, "there are little issues here and there, but the most important thing is whether Harrison Garcia effectively communicated a request for a lawyer." Id.  The undersigned agrees.   Accordingly, the lion's share of this Report and Recommendation shall focus on same.    The collateral, or smaller issues, shall be briefly discussed in order to make a full record.

## Search Warrants

### *Instagram Account "muhammad_a_lean."*

---

[3]Pursuant to Franks v. Delaware, the Court must hold a hearing if Defendant makes a substantial preliminary showing that the affidavit supporting the warrant contains an intentional or reckless falsehood or omission. See  Franks v. Delaware,  438 U.S. 154 (1978).

[4]All references to the suppression hearing shall include page and line designations.  The transcript can be found at **(ECF No. 59)**.

As noted above, on September 27, 2016, HSI agents presented a search warrant application before U.S. Magistrate Judge Patrick A. White. **(ECF No. 35-3)**.  In support of the application, HSI Special Agent Kevin Selent ("Agent Selent"), the affiant, states that agents began monitoring several Instagram accounts by creating their own accounts and submitting "friend requests" to the target accounts. Id.  The targets consented to agents viewing their accounts by "accepting" the agent-associated accounts and "adding" them as friends. Id. Once on Defendant's Instagram page,  i.e., "Muhammad_a_lean," agents observed photographs of firearms and bottles of promethazine with codeine. Id.  The page also contained images of marijuana in quantities consistent with the distribution of narcotics. Id.  Agent Selent's affidavit in support of the search warrant provides the following detailed description of the images.

(a)     On or about September 14, 2015, a photograph of GARCIA and another male. GARCIA is holding two suspected firearms, while the unknown male is holding another suspected firearm.

(b)     On or about January 11, 2016, a photograph of GARCIA with a bottle of promethazine with codeine syrup next to him.

( c)    On or about January 26, 2016, a photograph of GARCIA standing at a counter top with several suspected bottles of promethazine with codeine syrup next to him.

(d)     On or about March 28, 2016, a photograph of suspected 'moonrocks," a type of marijuana, with the caption "New flavor alert."

(e)     On or about May 20, 2016, a photograph of GARCIA holding a large quantity of U.S. Currency with a bottle of promethazine with codeine syrup on the table.

(f)     On or about August 16, 2016, a photograph of GARCIA holding a suspected firearm with two other suspected firearms on the sofa nearby.

**(ECF No. 35-3)**.

Sometime thereafter, agents served  Instagram with a preservation request, asking that it preserve all posts, photos, and videos posted to the "muhammad_a_lean" account.  Id.  Instagram

4

complied.  Id.    The investigation further revealed that Defendant had two prior narcotics charges.

Id.  Specifically, on June 6, 2013, he pled guilty to possession with intent to distribute cocaine, a 2nd

degree felony, possession with intent to distribute cannabis, a 3rd degree felony, and possession with

intent to distribute a controlled substance, a 2nd degree felony.  A few weeks later, on June 21, 2013,

he pled guilty to possession of a controlled substance, a 3rd degree felony.  **(ECF No. 35-3)**.

According to the affidavit, law enforcement confirmed through multiple sources of

information, that Defendant is a "major distributor of promethazine with codeine, marijuana, and

other controlled substances, in Miami-Dade County."  Id.  These sources also confirmed  that

Defendant's narcotics customers direct message[5] him through his "muhammad_a_lean" Instagram

account, in order to make purchases.  Id.  In this connection, the affidavit recounts the two controlled

narcotics purchases noted *supra*.  Id.  Both transactions were audio and videotaped.  Id.  In both

instances, agents observed Defendant leaving his residence and driving to the predetermined

location.  Id.  During the August 26th transaction, Defendant sold the CI two pints of promethazine

with codeine, 250 grams of marijuana, and 7 grams of  moon rocks.  Id.    On September 23rd,

Defendant sold the CI two pints of promethazine with codeine.  Id.  Following the controlled

purchases, on September 26, 2016, agents continued reviewing Defendant's Instagram page.  Id.

Again, they observed photographs depicting Defendant with promethazine with codeine, marijuana,

firearms and large amounts of U.S. currency.  Id.  In the affidavit, Agent Selent further avers that a

Florida Department of Revenue 'wage and earnings check' revealed that Defendant has not declared

income since 2011.  Id.

Based upon  Agent Selent's affidavit, and the exhibits attached thereto, Judge White found

_____

[5]Direct messages to Instagram users are private, and cannot be viewed publically.

that there was probable cause and issued the search warrant for the "muhammad_a_lean" Instagram account.  **(ECF No. 35-3)**.

### Target Premises

As noted *supra*, on October 14, 2016, HSI agents presented a search warrant  application before U.S. Magistrate Judge Alicia M. Otazo-Reyes.  **(ECF No. 35-4)**.   The application relates to the target premises, i.e., 7751 S.W. 29th Street in Miami, which was known to be associated with Defendant.  Id.  In support of the application, HSI Task Force Agent Roberto Fernandez ("Agent Fernandez") submitted an affidavit.  Id. In the affidavit, he states that HSI investigations identified Defendant as an importer and distributer of methylone/ethyolone (commonly known as "molly"), as well as lean, cocaine and marijuana.   Id.  Agent Fernandez' affidavit describes the same photographs used in the Instagram search warrant application, and also discusses the August 26th controlled narcotics purchase, and the negotiations associated therewith.  Id.  Similarly, his affidavit also lists Garcia's prior criminal records and lack of reported income since 2011.  Id.

According to the affidavit,  law enforcement determined that Defendant was residing at the target premises sometime in August 2016.  Id.  During the course of surveillance, agents observed Defendant, and several of his known vehicles, at the residence on multiple occasions.  Id.  Utilizing several real estate websites, agents conducted an "open-source media search" of the target premises. This allowed them to view the interior and exterior of the residence which, in turn, enabled them to connect the Instagram images with same.  Id.  For example, on October 4, 2016, agents observed a photo on Defendant's Instagram page that depicted him standing in the enclosed driveway of the target premises, leaning on a Porsche Panamera, and posing with large amounts of U.S. currency. Id.

The affidavit further indicates that agents viewed Defendant's Snapchat[6] account, i.e., "harry3o5."  Id.  On Snapchat, they viewed a video titled Actavis.[7]  In the video, Defendant is "holding a 20-ounce bottle of Sprite with a white opaque liquid and purple liquid." **(ECF No. 35-4)**.  The video also depicts the interior of a residence with a distinct wooden framed door and horizontal blinds.  Id. at ¶ 12.  A comparison of the real estate website images, with those in the Snapchat video confirmed that the wooden door depicted in same is located inside the target premises.  Id.  Lastly, the agent describes a trash pull outside of the target premises on October 12, 2016.  Id.  The pertinent part of the affidavit states,

> ... at approximately 8:20 P.M., law enforcement observed a green trash bin that had been placed on the publicly accessible swale for garbage collection in front of the TARGET LOCATION.  Agents retrieved the contents of the trash bin and found inside two (2) empty 16-ounce bottles of "Hi-Tech" brand promethazine with codeine (street value of approximately $1,000 per bottle), one (1) empty 16-ounce bottle of "Qualitest" promethazine with codeine (street value of approximately $750 per bottle), and four (4) empty cigar packages with the tobacco contents inside (commonly used to re-roll marijuana cigarettes/joints).

Id. at ¶ 13.

Based upon Fernandez' affidavit, and the exhibits attached thereto, Judge Otazo-Reyes found probable cause and issued the search warrant for the target premises.  **(ECF No. 35-4)**.

### Validity of the Search Warrants

Here, Defendant argues that both affidavits lacked the requisite probable cause.  Among other things, Defendant argues that much of the information contained therein originated from unreliable

---

[6]Snapchat is also a web-based image messaging application that can be accessed through mobile devices.  The application allows users to instantly upload videos and post them online for viewing in a "snap."

[7]Actavis is a pharmaceutical company that manufactures promethazine with codeine. **(ECF No. 35-4)**.

and untrustworthy CIs who remain undisclosed.  In other words, Defendant argues that agents should have provided details as to the basis of the CIs' knowledge "so that the issuing magistrate would have competent and complete information."[8] **(ECF No. 26)**.  Because the affidavits lacked this information, Defendant contends that the resulting search warrants are invalid.

As a general matter, affidavits submitted in support of a search warrant application are presumed valid.  Franks v. Delaware, 438 U.S. 154, 171 (1978).   In order to overcome that presumption, there must be allegations of deliberate falsehood or reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  Id.   In other words, the movant must specify the portion of the affidavit that is claimed to be false, and provide supporting affidavits and/or sworn witnesses statements.  Id.  Allegations of negligence, without more, are insufficient. Id.  In sum, the defendant must make a substantial preliminary showing that the affidavit contains an intentional or reckless falsehood.  If this burden is met, the court must hold a Franks hearing.[9]  Defendant herein has requested just that.  The Government opposes the request and argues, *inter alia*, that Defendant has failed to provide any support for his allegations.   This Court agrees.  Consistent with the  reasons stated herein, the undersigned finds that Defendant falls short of his preliminary burden.  Accordingly, a Franks hearing is not warranted.

In order to establish probable cause, a search warrant affidavit must contain facts sufficient

---

[8]Although not relevant at the time of the application, it bears noting that Defendant's Request for Klyles, Giglio and Brady Information **(ECF No. 29)**, which requested information on the CIs used in the investigation, was recently denied by Judge Seitz.  **(ECF No. 40)**.  In the Order denying the request, the Court found, among other things, that "given [Defendant's] proclivity towards social media, disclosure may endanger the informants themselves or other ongoing investigations."  Id.

[9]If the requirements are met as to a certain of portion the materials, but there otherwise remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.  Id. at 171- 172.

to justify a conclusion that evidence or contraband will probably be found at the premises sought to be searched. United States v. Womack, No. 05-15218, 2007 WL 13836, at *1 (11th Cir. Jan. 3, 2007)(quoting United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002). As correctly noted by the Government, the affidavit should establish a connection between the defendant, the premises to be searched, and any criminal activity. United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002). Applying the law to the facts of this case, and having carefully considered the above noted affidavits, the undersigned finds that both search warrants are valid.

### Defendant's Arrest

At the hearing, Agent Sliazas testified that he was involved in the above investigation, including the review of Defendant's Instagram page, the search warrants, and the controlled narcotics purchases. Hr'g Tr. 22:8-25; 23:23-25. He also participated in Defendant's arrest on October 18, 2017. Hr'g Tr. 24:18-25. In preparation for the arrest operation, and in light of what was observed on social media, i.e., multiple weapons, including an FN pistol, Glock firearms, an UZI and an AK-47, the decision was made to have several agents,[10] including a special response ("SRT") or SWAT team, on the scene. This was obviously done for the safety of law enforcement, the public, and that of Defendant. Hr'g Tr. 23:1-19;25:12-25. In furtherance of this goal, as well as the preservation of evidence, agents planned to apprehend Defendant once he was away from the residence. Id. Accordingly, they waited for him to leave the premises, in order to effect the arrest. Hr'g Tr. 27:3-15.

Agent Sliazas further testified that he personally removed Defendant from his vehicle. Hr'g

---

[10]The operation also included Customs and Border Protection ("CBP") agents, as well as a CBP helicopter conducting surveillance of the area. Hr'g Tr. 26:1-11.

Tr. 27:16-19.  At the time, Defendant was accompanied by three male passengers.  Id.  Defendant's hands were up when the agent approached.  Hr'g Tr.  27:21-25.  The agent grabbed Defendant, put him on the ground, away from the vehicle, and placed him in handcuffs.  Id.  He stayed with Defendant until the other agents completed their assigned tasks.  Id.   Sometime thereafter, he introduced himself and made sure that Defendant was not injured.  Hr'g Tr.  28:10-24.  Once Defendant was secured, Agent Sliazas reholstered his weapon, tried to establish a rapport, and reassured him that "everything was going to be fine."  Hr'g Tr. 31:17-19; 42:12-15.   In order to make Defendant feel comfortable,  agents later offered him food, cigarettes and water.  Hr'g Tr. 43:10-20.    The agent testified that in these circumstances, it is his practice to start the conversation "as humble as possible."   Id.    Along these same lines, he stated that agents did not threaten Defendant in any way.  Hr'g Tr. 42:3-11.

At some point, he asked Defendant to provide him with keys to the residence, so that the SRT could just unlock the gate and the front door, as opposed to destroying the house to gain entry.  Hr'g Tr.  29:3-16.  In response, Defendant expressed concerns for his dogs, "Moonrock" and "Blu Ivy,"[11] both of which were at the residence.  Id.  For everyone's safety, the agent asked Defendant for the location of the dogs, as well as the names of any individuals in the residence.  Hr'g Tr. 29:17-25.  According to Agent Sliazas, Defendant provided the keys, and the SRT entered the residence.  Id.  There was no attempt to interview Defendant at that time.  Hr'g Tr. 30:10-15.  He testified that agents waited until after the execution of the search warrant, and the securing of evidence,[12] before

---

[11]The dogs appear to be named after a type of marijuana and, "Blu Ivy," the daughter of rapper Jay Z and, music artist, Beyonce.

[12]The search of the target premises resulted in the recovery of a money counter, a digital scale, marijuana, and packaging materials.  Hr'g Tr. 45:3-8.

transporting Defendant back to the target premises.  Hr'g Tr.  30:10-25.  Once there, his handcuffs were removed, and both Agents Selent and Sliazas  advised  him of his Miranda rights.  Hr'g Tr. 31:2-8.

When, as here,  the constitutional validity of an arrest is challenged, it is the function of the court to determine whether the facts available to the arresting officers at the moment of the arrest support a finding of probable cause.  United States v. Allison, 953 F.2d 1349- 1350 (11th Cir. 1992) (citing  Beck v. Ohio, 379 U.S. 89 (1964).   A warrantless arrest is appropriate if, at the time, law enforcement possessed probable cause to effect the arrest.  Allison 953 F.2d at 1349-50.  Probable cause does not require an *actual* showing of criminal activity.  Instead, it  requires only a *probability* or substantial chance of such activity.  Id. at 241.   In other words,  Probable cause exists where the facts and circumstances within an officer's knowledge, and of which he had reasonably trustworthy information, are sufficient to warrant a person of reasonable caution in the belief that an offense has been, or is being, committed by the person to be arrested.  Allison, 953 F.2d at 1350 (citing United States v. Waksal, 709 F.2d 653, 658, n. 8 (11th Cir.1983)).

In  Allison,   Drug Enforcement Administration ("DEA") agents were conducting an undercover operation at AWC  Chemical Company ("AWC") in Eight Mile, Alabama.  Id. at 1347. Agents were specifically investigating orders for chemicals used to manufacture phenylacetone ("P2P"),  an amphetamine.  Id.  The orders in question were placed by  Raymond Allison.  Id. at 1348,1350.  Allison used a fake name and arrived to pick up the chemicals in  a rented vehicle with Texas license plates.   Id.   He paid with a money order, and expressed an interest in  making additional purchases without the required paper work.  Id. at 1351.  While there, he voiced concerns

about surveillance,  telling undercover agents that he only chose AWC because he heard that they were not on law enforcement's radar.  Id. at 1348.  After the purchase, agents followed Allison and he was arrested.  Id.  A search of his vehicle revealed syringes, a spoon and methamphetamine residue.  Id.  Under these circumstances, the Eleventh Circuit upheld the warrantless arrest and noted that, "when considered together, [the facts] were sufficient to form a reasonable belief that Allison was conspiring to manufacture a controlled substance." Id. at 1351.

Here, as noted by Agent Sliazas, Defendant's car was stopped and he was arrested following the investigation detailed above.  At the time, agents had, among other information, the search warrant returns, the trash pull, and the controlled narcotics purchases.  Looking at the totality of the circumstances, it is fair to say that there was more than a probability that Defendant was engaged in criminal activity.   Accordingly, upon careful consideration of the search warrant applications, the affidavits in support,  the testimony of Agent Sliazas, and the law in this area, the undersigned finds that agents had probable cause to arrest Defendant on the day in question.

### Vehicle Search Incident to Arrest

Having found that the arrest of Defendant was lawful, the undersigned shall now turn to the vehicle search following his arrest.  As indicated above, Defendant argues that he and the occupants of the vehicle were forcibly removed by approximately ten to twenty fully armed agents. **(ECF No. 26, 56)**.  Specifically, Defendant testified that agents broke the glass on the front driver and passenger sides with riffles and took him out – never giving him a chance to exit on his own.  Hr'g Tr.  78:13-25. According to Defendant, he was then thrust onto the ground and handcuffed.  Id.  In his view, he had no possibility of access to the vehicle during the search.  Id.   Therefore, he concludes that the search was illegal.

12

Circumstances unique to the vehicle context justify a search incident to a lawful arrest. Arizona v. Gant, 556 U.S. 332, 343 (2009)(citing Thornton v. United States, 541 U.S. 615, 632 (2004)). In Gant, the Supreme Court explained that the following instances permit officers to search a vehicle incident to arrest: (1) when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search, or (2) when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle. Gant, 556 U.S. at 343 (quoting Thornton v. United States, 541 U.S. 615, 632, 124 S.Ct. 2127, 2137, 158 L.Ed.2d 905 (2004) (Scalia, J., concurring in the judgment)). There, the Court noted that where an occupant is arrested for a drug offense the 'offense of arrest' itself supplies the basis for searching the passenger compartment and any containers therein. See id. at 344.

Further, as explained by the Eleventh Circuit, the automobile exception authorizes a search of a vehicle if the vehicle is readily mobile, and officers have probable cause for the search. United States v. Alston, 598 Fed. Appx. 730, 734 (11th Cir. 2015), cert. denied, 136 S. Ct. 560 (2015)(citing United States v. Lindsey, 482 F.3d 1285, 1293 (11th Cir. 2007). The mobility requirement requires only that the car be operational. Id. In Alston, the Court explained that because probable cause existed to search the vehicle for evidence of drug-trafficking activity, officers were permitted to search the areas where the two guns were found—the glove compartment and the area under the driver's seat. Alston, 598 Fed. Appx. at 734; see also, United States v. Ross, 456 U.S. 798, 825 (1982). Here, a search of the vehicle revealed, *inter alia*, a backpack[13] with a loaded firearm and drugs.

_____

[13]When questioned as to whether he owned the backpack and its contents, and whether his driver's license was found in same, Defendant provided the following response, "I mean, we all had our stuff in there. We were all going to the studio and we had our stuff in there together." Hr'g Tr. 118:1-25.

Applying the law to the facts of this case, and again, taking into consideration the search warrant applications, the affidavits in support, and the testimony of Agent Sliazas, the undersigned finds that the search of the Chevy Suburban, incident to Defendant's arrest was proper.

### Waiver of Miranda and Consent Search

It is well established that Miranda warnings should precede any custodial interrogation. See Miranda v. Arizona, 384 U.S. 436, 444 (1966); see also United States v. Brown, 441 F.3d 1330, 1347 (11th Cir.2006) (a defendant is deemed to be in custody when there is a formal arrest and/or a restraint of movement comparable to same).  A party can waive these rights if the waiver is voluntarily, knowingly, and intelligently given. Moran v. Burbine, 475 U.S. 412 (1986)(citing Miranda, 384 U.S. at 444, 475).   In making this determination, Courts rely on a two-part test.  Id.

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Id. (citing Fare v. Michael C., 442 U.S. 707, 725(1979).  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned, and the consequences of the decision to abandon it.    Id.   In this connection, the Court may consider the defendant's education, age, intelligence, the length of detention, the prolonged nature of detention and the defendant's health. United States v. Bernal-Benitez, 594 F. 3d 1303, 1319 (11th Cir. 2010).  In sum, a court may conclude that the Miranda rights were waived only if "the totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension Id. at 1318.

Here, Defendant flat out denies ever having waived his rights.  He testified that he requested a lawyer, at least three times, and was denied. Hr'g Tr.  79:1- 25; 80:1-25; 81:1-25.  Agent Sliazas,

on the other hand, testified that Defendant never asked for an attorney in his presence.  Hr'g Tr.  32: 6-13.   Instead, it is the agent's testimony that Defendant knowingly waived his Miranda rights, executed a consent form, and voluntarily spoke with law enforcement.  Id.  Defendant admits that the contents of the forms were read to him, and he concedes that he understood them.  Hr'g Tr. 87:3-7.   However, he denies ever having seen the forms (prior to discovery) or executing them. Hr'g Tr.  86:23-25; 87:1-2.   Along these same lines, he denies that any of the writing or signatures on the documents belong to him.  Hr'g Tr. 89:1-24. He also testified claims that Agent Sliazas was not present when the forms were presented, read and explained to him.  Hr'g Tr.  87:15-20. Instead, he claims that it was Agent Selent who read him his rights.  Hr'g Tr. 88:1-7.   The relevant waiver/consent forms and related testimony shall be discussed below.

### *Waiver*

The waiver form at issue is comprised of two sections.  They are titled "STATEMENT OF RIGHTS" and "WAIVER." **(ECF No. 56-1)**.  The 'rights' section channels the well known Miranda language, and lists, among others, the right to remain silent, and the right to consult with an attorney. **(ECF No. 56)**.  The 'waiver' section states, "I have had the above statement of my rights read and explained to me and I fully understand these rights.  I waive them freely and voluntarily, without threat or intimidation and without any promise of reward or immunity."  Id.

It is Agent Sliazas' testimony that he read and explained each right listed on the form to Defendant, in English.  Hr'g Tr. 35: 5-20.    At no time did Defendant appear to be under the influence of alcohol or narcotics.  Hr'g Tr. 38:3-19.   Further, at no time during the dialogue did Defendant communicate a lack of understanding of either the forms, or the conversation.  Id. According to the agent, the execution of the forms took place outside of the target residence next to

Agent Selent's vehicle. Hr'g Tr. 36:1-8. By that time, Defendant was uncuffed and the agents' firearms were either holstered or slung in a safe position. Id.

Agent Sliazas testified that he is "one hundred percent" certain that Defendant never asked for a lawyer in his presence. Hr'g Tr. 67:4-21. Instead, Defendant expressed an interest in speaking to the agents, and executed the forms in front of him. Hr'g Tr. 33:10-16; 36:15-23; 37:1-6. In fact, during the hearing, Agent Sliazas specifically stated, "that is definitely his signature... I saw him sign it." Hr'g Tr. 37:4-25. After he executed the form(s), and upon questioning, Defendant made inculpatory statements as to his criminal activity and his role in the crimes described above. Hr'g Tr. 39:1-3.

### *Consent Form*

In the same fashion, Defendant purportedly executed another HSI form titled CONSENT TO SEARCH. This form states, "I Harrison Garcia[14] have been informed by [ICE] Special Agent[s] Kevin Selent & Rim Sliazas of my right to refuse to a search of my property." **(ECF No. 56-2)**. The form also contains the following acknowledgment,

> I hereby voluntarily and intentionally consent to allow ICE to search my property. My consent is freely given and not the result of any promises, threats, coercion, or other intimidation. **I have read the above statement and understand my rights**."

Id. (emphasis in original).

Again, Agent Sliazas testified that he personally presented the form to Defendant, and Defendant executed same in his presence.[15] Hr'g Tr. 39:3-25; 41:7-19. The document, dated October 18, 2016 at 9:50 p.m., depicts Defendant's signature, as witnessed by both agents. Id.

---

[14] The underlined text reflects the portions of the form that were handwritten. **(ECF No. 56-2)**.

[15] Both agents executed the form(s) as witnesses.

Again, Agent Sliazas testified that at no point did Defendant express confusion or a lack of understanding as to these forms.  Hr'g Tr. 43:17-23.  Further, he never heard Defendant ask that the search be stopped, or indicate that the agents had exceeded the scope of his consent.  Id.

It bears noting that this form not only lists the target premises, but also two additional locations, an apartment on Kendall drive, and a separate storage unit. Id.  The agent testified that through their investigation, they "had some idea" that the Kendall apartment existed and was linked to Defendant.  However, they did not know the exact address and had not obtained a search warrant for same. Id.  According to Agent Sliazas,  it was actually Defendant that provided them with the address and the keys.  Hr'g Tr.  46:1-13.  Agents likewise had no knowledge of the location of Defendant's storage unit.  Again, the agent testified that it was Defendant that provided them with the address and rode with them to the location.  Hr'g Tr. 46:13-26; 73:23-25; 74:1-2.  Along these same lines, Defendant also provided agents with the passwords for his cellphones.  Hr'g Tr.  74:1-12.

As noted above, Agent Sliazas provided detailed testimony as to the manner in which he advised Defendant of his rights.  Throughout his testimony, he consistently stated that he was with Defendant during most of the relevant time period.  Again, he testified that he personally removed Defendant from the vehicle and stayed with him until the other agents finished their assigned tasks. Hr'g Tr. 27:16-25.  At first, he was with Defendant at the initial location of the arrest.  Hr'g Tr. 54:13-23.  Later, he was with Defendant outside of the target premises.  In fact, he testified that he had nothing to do with the entry into the target premises because, "[he] was with Defendant [outside of the residence] the whole time." Hr'g Tr. 57:14-17.  Indeed, it was outside of that residence, next to Agent Selent's vehicle, that Defendant Agent Sliazas claims to have advised Defendant of his rights.  Hr'g Tr. 35:5-25; 36:15-23.  Again, when asked how he knew that was Defendant's

signature on the forms, the agent simply responded, "I saw him sign it."  Hr'g Tr. 37:1-25.

> When asked, in Court, if he was implying that the HSI agents fabricated the consent forms,
Defendant responded as follows.

> Q.   Is it your view, your opinion that the agents from Homeland Security forged Government's Exhibit 1 and Government's Exhibit 2?
>
> A.   I mean, I really don't have no view on it like that, but, I mean, I wouldn't suppose – I wouldn't say that they did that, but that's not my signature and that's not my handwriting —
>
> Q.   And you never saw these forms?
>
> A.   I wouldn't consent to that.  No sir.

Hr'g. Tr. 114:1-25.

> Defendant insists that he immediately requested to speak with his attorney,[16] even while the keys to his vehicle were still in the ignition.  Hr'g Tr.  84:3-10.  However, he could not specifically identify the agent to whom he made the request.   He claims that Agent Sliazas, the testifying agent, was not present at the time,  but that Agent Selent was.   Hr'g Tr. 78:14-18; 81:1-8; 86:7-13.  At the hearing, Defendant pointed to an agent in the back of the courtroom, and identified him as being present "in the car the third time he asked for [his] lawyer."  Hr'g Tr. 81:9-14.   It is Defendant's testimony that his requests were ignored, and that Agent Selent specifically told him that he did not have the right to an attorney at that time.  Hr'g Tr. 88:10-16.

> He testified that he never intended to cooperate, and that he never voluntarily provided the keys to agents.  Hr'g Tr. 84:9-14; 91:21-22.   As he recalls it, "[the agent] told him that if [he] didn't give [them] the keys [they] [were] going to kill both of [his] dogs."  Hr'g Tr. 83:15-24.   During this

---

[16]Defendant explained that his current counsel, Ms. Munoz, who has represented him on other matters, advised him to always request an attorney when confronted by law enforcement.   He claims that he did exactly that in this instance.  Hr'g Tr. 80:1-5.

time, he claims that he was separated from the others, and was told he was facing 20 years in prison. Hr'g Tr. 91:11-14.  He described feeling "against the wall," and without many options.  Hr'g Tr. 92:2-6.  He concedes that he was taken to the second location, i.e., the apartment building on Kendall Drive, but claims that he remained in the car.  Hr'g Tr. 93:13-16.   He likewise denies having consented to the search of the apartment.[17]  Hr'g Tr.  93:1-24.

In light of Defendant's position,  the Court is forced to make a credibility assessment.  Here, Defendant conceded that the Instagram account in question was his and that the images portray, among other things, him holding weapons and bottles of promethazine with codeine.[18]  Hr'g Tr. 96:1-25.  He explained that the photos with drugs, guns and money were meant to make him look like a big shot, and boost his career in the rap music industry.  Hr'g Tr. 124:1-20.   In this connection, he claims to have worked for, and been paid by, high profile rappers such as Lil Wayne, Chris Brown, and Future.  Hr'g Tr. 124:21-25.

When questioned about the large amounts of currency in the photos, he attributed it to nothing more than boasting on social media.  Specifically, he testified,

> There [would] be occasions where I would go to the bank and withdraw money and just put it on, just flex it, like, you know.  It was kind of stupid [on] my behalf to do that, now that I look back at it, but you know, at that point it made me feel like, you know, I was in a music video, so...

Hr'g Tr. 124:9-14.

---

[17]The Government also produced a Notice of Abandonment and Assent to Forfeiture form executed by Defendant.  **(ECF No. 56-3)**.  In the forms, Defendant purportedly agrees to abandon and forfeit among other things, two (2) Glock pistols, an AK-47, an UZI Pistol Pro 9mm weapon, $15,000 in U.S. currency, various gold and silver jewelry and a Rolex watch.  Id.

[18]He claims that he consumed the drug on a daily basis, drinking one bottle every two days for three years straight.  Hr'g Tr. 122:12-25; 123:1-25.  Perhaps, that explains his extensive knowledge of the street value of same. Specifically, upon questioning, he testified that a bottle can range between $600-1,000.  Hr'g Tr.104:1-25; 105:1-4.

In other words, Defendant suggests that the currency he was flashing was earned by legitimate means.  Interestingly, however, as indicated above, the investigation by agents revealed that he has not declared income since 2011.   Equally interesting is his response to questioning about whether he was ever involved in drug trafficking.

> Q:    And prior to October 18th, were you also involved in drug trafficking.
> A.    No, sir.
>
> Q.    Not at any point?
> A.    No, sir.

Hr'g Tr. 94:4-8.

> Q.    And if I have videos of you exchanging drugs for money, how would you explain that?
> A.    I don't know.

Hr'g Tr.  94:16-20.

> Q.    Sir, how would you explain it?
> A.    I can't explain it.
>
> Q.    But you for sure were not involved in drug trafficking?
> A.    I wasn't.
>
> Q.    That's your testimony under oath to this honorable court?
> A.    I was never drug trafficking.
>
> Q.    Drug seller? How about that, is that a better phrase?

Hr'g Tr. 95:1-25.

Defendant provided no response, even after the following questioning by the Court.

> THE COURT:       You have to answer the question.  Were you ever a drug seller?
> MR. OSBORNE:     I'll move on, Judge.
>
> THE COURT:       Was there an answer to that, for the record?
> MR. OSBORNE:     There was not.
>
> THE COURT:       There was no answer.  Okay.

Id.

Upon further questioning, and after being confronted with state court conviction documents, Defendant admitted that he had a previous conviction/guilty plea for possession of a controlled substance.  Same resulted in a withholding of adjudication.  Hr'g Tr.  109:1-25.   During the colloquy, Defendant testified as follows.

> Q.     And, Mr. Garcia, so you testified that you would not consider yourself to be a drug
>          seller or a drug dealer, but haven't you been previously convicted of a narcotics
>          offense?
> A.     What narcotics offense?
>
> Q.     Any narcotics offense.  Have you ever been convicted os a narcotic offense?
> A.     I got charged with possession with intent to sell before.  Marijuana.
>
> Q.     Okay.  And how did you plead to those charges?
> A.     With a withhold.
>
> Q.     How did you plead?  Guilty or not guilty?
> A.     I took a withhold, whatever that's supposed to mean.  Withholds adjudication.
>
> Q.     So, if I was to show the Court a judgment that showed that you plead guilty, would
>          you take the position that the position that that document was forged?
> A.     Is a withhold [of] adjudication a plead of guilty?

Hr'g Tr. 107:19-25; 108:1-25.

Thereafter, defense counsel stipulated that the referenced documents related to  Defendant's 2013 state court drug cases.  Hr'g Tr.  109:5-15.  Defendant then testified that he did recall being arrested, at home, on March 20, 2013 for allegedly selling drugs.  Hr'g Tr.  110:8-15.  Defendant initially denied, that on that occasion, he admitted to law enforcement that drugs and a gun found on the property belonged to him.   Id.  Later, when questioned as to whether he had waived his Miranda rights on that occasion, Defendant responded as follows.

> Q.     Do you remember being advised of your Miranda rights in that case?
> A.     Yeah, I believe so.

21

Q.    And do you remember waiving them and agreeing to speak with the police?

A.    I never spoke with the police but I did waive my rights that day.

Hr'g Tr. 110:20-25.

Q.    So when the officer in that record says that you waived Miranda and confessed that the property, the drugs and the gun belonged to you, that officer was lying?

A.    No, sir, he was not lying.  The reason I did that was because they were going to take my girlfriend and the kids to jail, so, I just did what I had to do there to not get them in trouble.

Q.    So a moment ago you said that you were not  – you didn't speak to the police.  Now you're correcting that to stay that you –

A.    I ain't speak to the police in the sense that, I thought you meant like a confession or something like that.  What I'm saying was that I did waive my Miranda rights [that day]..., but I learned from my experience.

Hr'g Tr. 111:1-16.

With respect to the instant case, Defendant also testified that the target premises was not his residence.   However, upon further questioning, he admitted that he "had access to" certain rooms in that house.  Hr'g Tr.  129:4-9.  Specifically, while referring to Gov. Ex. 5, he stated,

No, it wasn't my room, but I had access to that room.  That was where the weed was at, but from what I recall, that box and stuff like that, it wasn't like that.  I believe it was in the dresser.  It wasn't out just like that, like how everything is just in plain view like that.

Id.

In this connection, he testified that he had just been in that room to "grab some personal weed," right before exiting the target premises on October 18th, the day of his arrest.   Id.

With respect to the other location, the Kendall drive apartment, he stated   "that's not specifically my bedroom, but I was staying there... from time to time." Hr'g Tr. 133:1-16.  He also identified some of his personal items, e.g., clothes depicted in a photo of said location. Id.   He denied that a gun found at that location was his.  Id.    Yet, he conceded that he was pictured on

22

Instagram holding that same gun on numerous occasions.  Id.

Upon careful consideration of the testimony, the entire court file, including the search warrants and supporting affidavit, the undersigned finds Defendant's testimony not to be credible.

Having made that determination, the undersigned must determine whether there was a waiver, and if so, whether said waiver was voluntarily made rather than a product of intimidation, coercion, or deception.  Fare v. Michael C., 442 U.S. 707, 725 (1979).   In short, Defendant must have had a full awareness of both the nature of the right being abandoned, and the consequences of the decision to abandon it.    Here,  Defendant has an obvious command of the English language. He graduated high school and attended college.  Hr'g Tr. 93: 23-25.  He also testified that he works as a music producer, generating beats and instrumentals for top rap artists.  Hr'g Tr.  94:2-4. Further, Defendant appears to be very familiar with the criminal justice system, its terminology, and the workings of same.  As noted above, he has been the subject of prior searches and seizures by law enforcement, and has, on at least one  occasion, permitted officers to conduct searches of his property.  In light of his prior arrests and convictions, he clearly understands the consequences associated with the relinquishing of his rights.

## Conclusion

Here, nothing in this record suggests a prolonged interrogation, threats, intimidation or coercion.  The record is likewise devoid of any suggestion that Defendant was injured, sleep deprived, drugged, inebriated or otherwise incapacitated.  Given the totality of the circumstances, the representations made by the Government, and the testimony of the agent, the undersigned finds that Defendant's executed the waiver, consent and abandonment forms, and his subsequent statements were made knowingly, intelligently and voluntarily, consistent with the evidence

documented above.   Accordingly, it is **RESPECTFULLY RECOMMENDED** that Defendant's Motion to Suppress **(ECF No. 26)** be **DENIED**.

In light of the pending trial date, the time for filing objections shall be expedited.  **The parties shall have ten (10) days from service of this Report and Recommendation within which to serve and file written objections**, if any, with the Honorable Patricia A. Seitz, United States District Judge for the Southern District of Florida.  Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein.  Loconte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988); R.T.C. v. Hallmark Builder, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

**RESPECTFULLY RECOMMENDED** in Chambers at Miami, Florida, this 9th day of February 2017.

**WILLIAM C. TURNOFF**
**UNITED STATES MAGISTRATE JUDGE**

cc:      Hon.  Patricia A. Seitz
         Counsel of Record